## CIRCUIT COURT OF THE CITY OF RICHMOND

Commonwealth of Virginia,
ex rel. James S. Gilmore, III,
Attorney General

v.

Smoky Mountain Secrets, Inc.,
and Western Surety Co.

April 1, 1997

Case No. HG-162-1

BY JUDGE MELVIN R. HUGHES, JR.

This case has been under advisement after a four day bench trial in April, 1996. Following the trial there was an issue of constitutionality which was briefed and argued and on which the court ruled in July, 1996.[1] After that, the parties submitted their respective proposed findings of fact and conclusions of law.

In this proceeding, the plaintiff, the Commonwealth of Virginia, *ex rel.* James S. Gilmore, III, Attorney General, filed a Bill of Complaint against Smoky Mountain Secrets and Western Surety Company alleging that Smoky Mountain violated the Virginia Solicitation of Contributions law in §§ 57-48 to 57-69 and the Virginia Consumer Protection Act in §§ 59.1-196 to 59.1-207.

Smoky Mountain is a Tennessee corporation engaged in the business of telemarketing, that is soliciting sales for products by telephone. In its activity

---

[1] 39 Va. Cir. 464. [Reporter's Note]

under scrutiny here, Smoky Mountain conducted solicitations on behalf of the Virginia State Police Association (VSPA). The VSPA is a labor organization whose membership is comprised of present and former employees and officers of the Virginia Department of State Police. The telemarketing activity was done from phone rooms around the state where telemarketers working for Smoky Mountain would telephone members of the public throughout Virginia and invite persons contacted to purchase food products to support VSPA's programs and activities. As such, Smoky Mountain fits the definition of a professional solicitor within the meaning of § 57-48.

In four counts, the Commonwealth alleged that Smoky Mountain has violated the statutes in the following ways. In count I, the Commonwealth alleges that Smoky Mountain violated § 57-55.2 of the Solicitation law when its telemarketers failed to identify or disclose that they were Smoky Mountain employees and that they or Smoky Mountain were paid solicitors for the VSPA. In count II, the Commonwealth alleged that Smoky Mountain violated § 57-57(L) of the Solicitation law by using a device, scheme or artifice to defraud or obtain money by misrepresentation or misleading statements. In count III, the Commonwealth alleges that Smoky Mountain violated § 57-57(F) of the Solicitation law by soliciting in the name of others without written authorization. Finally, in count IV, the Commonwealth alleges Smoky Mountain violated § 59.1-200(14) of the Virginia Consumer Protection Act by use of deception, fraud, false pretense, false promise, or misrepresentation in connection with consumer transactions.

The evidence came from a set of written stipulations entered into by the parties, witness testimony, and exhibits. The witnesses called by the Commonwealth were two former Smoky Mountain phone managers, six former Smoky Mountain telemarketers, six Virginia Department of Consumer Affairs witnesses, some of whom had operated undercover in Smoky Mountain phone rooms as telemarketers, Ricky Duling, a.k.a. Sergeant Santa, the executive director of VSPA, and eight members of the public who had received telephone solicitations from Smoky Mountain telemarketers. Smoky Mountain called its regional manager, two phone room managers, three telephone marketers, and Colonel Robert Suthard, formerly of the Virginia State Police, who Smoky Mountain hired as a consultant.

Smoky Mountain takes the position that the testimony of most of the former telemarketers is not worthy of belief for one reason or another depending on which telemarketer is testifying. As examples, former telemarketer Pugh is a convicted felon, who only mentioned one conviction without disclosing another one on her application for employment. Telemarketer Dupree's credibility is doubtful because he was fired for making harassing telephone

calls. Another telemarketer, Lett, was fired for failing to perform his duties. Also, Smoky Mountain takes the position that considering the volume of calls throughout the Commonwealth, the deviations from the script the telemarketers were required to go by and to which Smoky Mountain demanded strict adherence to by its managers' constant monitoring on site at the phone rooms are only slight and are isolated events. In addition, Smoky Mountain maintains that in 1988, the Commonwealth agreed to notify it of any violations and provide reasonable opportunity to remedy or cure any problems, which was not done. It also maintains that the Commonwealth is seeking to apply the law unfairly because the Solicitation law is being applied to it while there is no application against labor unions and trade associations, both in terms of enforcement and remedies sought.

As mentioned above, the court ruled in July, 1996 on an issue of constitutionality. Smoky Mountain raised a question of the constitutionality of the Solicitation law because of a ruling that emanated from a proceeding in federal court in the case, *Special Programs Inc. v. Couter, etc.*, Civil Act No. 3:95CVC09 (E.D. Va. April 15, 1996). In federal court, another telemarketer received a ruling that an exemption of trade associations and trade unions in the Solicitation law was unconstitutional. The court declared the exemption unconstitutional but did not declare all of the statute unconstitutional. The court severed the disputed provision leaving the rest of the statute intact and enforceable. Given that ruling, Smoky Mountain sought to have this court declare the whole of the Solicitation law unconstitutional. This court declined to do so. It is not improper for the Commonwealth to seek enforcement against Smoky Mountain given that ruling.

This court has also earlier dealt with Smoky Mountain's claim that the Commonwealth had not afforded it an opportunity at voluntary compliance according to § 59.1-202 of the Virginia Consumer Protection Act. The court found that actions by the Commonwealth fairly apprised Smoky Mountain of suspected violations and did not foreclose this proceeding.

### *Summary of the Evidence and Findings of Fact*

As to the allegations set out in the four counts, after review of the record, the evidence adduced therefrom shows a pattern and practice of violations of both the Solicitation law and the Consumer Protections Act. By way of example, when making calls to the public, telemarketers omitted portions of their scripts that disclosed their paid solicitor status. Many telemarketers omitted the reference in the script that they were working for Smoky Mountain in their sales pitch. Many times, the "I am not a trooper" portion of the

disclosure was omitted as well as "This is not an official call." These and other omissions occurred regularly despite the company rule that telemarketers were to read their scripts word for word. Many times omissions were made with the knowledge of managers without corrective action. Smoky Mountain received notice in April 1992 and on several occasions after that date that the Virginia Office of Consumer Affairs had reason to believe that telemarketers were not identifying their employer or disclosing their status as paid solicitors when making calls. It was told that telemarketers were leaving the impression with those called that they were law enforcement persons or members of VSPA. At the trial, witnesses who were contacted said they thought they were speaking with such a person and as a result treated the calls differently than they otherwise would have.

There were many instances of the use of an alias by telemarketers when making calls. When on occasion telemarketers received questions about how much money went to VSPA, the responses varied. Some telemarketers told those called that anywhere from all the money to 75% of the money paid went to VSPA; others said 100%, others said 75% of the gross proceeds, others said 75% of the net profits after the cost of the product. In fact, the evidence showed, for the solicitation period covering 1992, the VSPA received 12.52% of the gross proceeds collected by Smoky Mountain. For 1993, VSPA received 12.85% of the gross proceeds collected. VSPA also did not receive 75% of the gross proceeds or profits after the "cost of the product" during the periods at issue.

Then there is the matter of whether contributions were tax deductible. This, too, telemarketers responded to on questioning by persons called in varying ways. Some telemarketers said that the amount paid, or a part of the amount, was tax deductible. Others said "100% tax deductible," some said a percentage but that the persons called would have to consult with their tax preparer for a determination. In fact, while VSPA is exempt from federal income tax pursuant to § 501(c)(5) of the Internal Revenue Code, contributions to it are not tax deductible to individual donors. Smoky Mountain's receipts for its product sales includes a disclosure to this effect in small print.

There is also the matter of how VSPA used the money it received. Persons called would inquire about this. Here too the responses varied. The telemarketers used scripts that highlighted the charitable causes VSPA supported, including various drug abuse prevention and child safety programs. In fact the monies were used to pay general operating expenses, insurance benefits for members, legal representation for members who filed grievances, and the cost of conferences and lobbying expenses of VSPA. VSPA used only a small percentage of the royalty monies paid for drug prevention and other

charitable programs. For example, during 1992 VSPA received at least $458,354.00 in royalties from Smoky Mountain and made contributions to charitable causes totaling $79,287.70. This represents only 17.3% of the total. Other times, telemarketers indicated that all amounts going to VSPA were used to purchase teddy bears that troopers gave to children in the DARE program. The evidence also revealed that representations were made that the product would be delivered by police officers when, in fact, the deliveries were made by delivery drivers who worked for Smoky Mountain.

There is also evidence that, on occasions in Richmond and Virginia Beach, when persons called desired to purchase products but did not want to take them themselves, telemarketers would advise that the products could be donated to other specific charitable organizations. In Richmond, Sergeant Santa was offered as a potential donee; in Virginia Beach, Christian Action was mentioned as a donee. Neither had provided a consent form giving Smoky Mountain written authority to solicit contributions on their behalf.

For these and other instances more specifically set out in the Commonwealth's proposed findings of fact 1-137, which the court accepts as its findings, liability attaches under the Solicitation law and the Consumer Protection Act.

Smoky Mountain has contended that the telemarketers are independent contractors and thus it is not liable for their actions which may not be in compliance with law. The court rejects this contention. Despite signed contracts under which telemarketers are called "independent contractors," in actual fact, Smoky Mountain had the right to exercise, and did exercise, control over the details of its telemarketers' work. The court concludes that, under the case law cited in the Commonwealth's proposed conclusions of law including the several factors listed in the Restatement of Agency mentioned therein, the telemarketers performed as agents and Smoky Mountain is liable for their wrongful acts committed within the scope of their employment. Accordingly the court accepts the Commonwealth's proposed conclusions of law 138-148.

## Civil Penalties

The Commonwealth has requested several remedies under enforcement provisions of the Solicitation law and Consumer Protection Act. Under § 52-59(D), an enforcement provision of the Chapter governing Solicitation of Contributions, the Commonwealth seeks civil penalties of up to $5,000 per violation. It contends that the evidence discloses 19,443 violations for failing to disclose telemarketers' real names, their employment with Smoky

Mountain, and the fact that they were paid solicitors. The 19,443 figure is based on the delivered sales of six telemarketers based on the evidence. The court accepts this as the number of violations and assesses $50 per violation for a total of $972,150.

Under § 57-57(F) the Commonwealth seeks up to $5,000 for four violations involving seeking donations for others, Sgt. Santa and Christian Action, without written consent. The court will impose a $500 amount for each of these for a total of $2,000.

Under § 57-57(L) of the solicitation law, the Commonwealth wants to recover up to $5,000 as a civil penalty for at least 8,778 violations involving telemarketer failures to identify themselves as working for Smoky Mountain and other representations that led those called to believe they were dealing with the state troopers or members or volunteers of VSPA. The court will award $100 for each of these for a total of $877,800.

For eight violations under § 57-57(L) involving false statements concerning the amount of money going to VSPA as described above, the Commonwealth seeks up to $5,000 civil penalty per violation. The court will award $500 for each of these for a total of $4,000.

For twenty-four violations involving tax deductibility under the same section, the Commonwealth seeks up to $5,000 per violation. The court awards $50 per violation for a total of $1,200.

For five violations under § 57-57(L) involving telemarketers falsely stating they were troopers and delivery persons, the court awards $1,000 per violation, for a total of $5,000.

For three violations under § 57-57(L) proved by the evidence involving false statements that portions of the purchase price for products would be used to support other charitable programs, the court awards $1,000 per violation for a total of $3,000.

Also under § 57-57(L), the Commonwealth contends that it proved 40,526 violations involving telemarketers' telling persons contacted that monies going to VSPA would be used by VSPA to support drug abuse prevention and other charitable programs and failing to state that the largest percentage of these monies (more than 80%) would be used by VSPA to pay its operating expenses. Under the same provisions authorizing up to $5,000 per violation, the court awards $100 per violation for a total of $4,052,600.

Under the Consumer Protection Act, the Commonwealth contends that proof of common law fraud is not required. The court agrees. Under the authorities cited in the Commonwealth's proposed conclusions of law 166-171, actual deception need not be shown, only a finding of tendency to mislead and deceive need to be shown, as is the case here. In terms of willfully

violating § 59.1-200(14), the court finds, as urged by the Commonwealth, that Smoky Mountain committed 19,451 such violations based on delivered sales. For these under § 59.1-206, a civil penalty of up to $4,000.00 for each violation is authorized. The court will award the sum of $4,862,750 at $250 per violation.

## Other Remedies

In addition to the civil penalties under the solicitation law and the Consumer Protection Act, the Commonwealth also seeks remedies of disgorgement, injunctive relief, and reasonable expenses in investigating and preparing its case against Smoky Mountain, and its attorney's fees. The Commonwealth also seeks a recovery against Western Surety in the amount of $20,000, the maximum amount of the bond Smoky Mountain provided. Pursuant to Commonwealth conclusion of law 163, the court awards judgment against Smoky Mountain, in the amount of $189,516 for restoration of the amounts Smoky Mountain received through charitable solicitations involving misrepresentations or misleading statements. The amounts the Commonwealth may collect on its judgment are to be held in a charitable trust administered by the office of the Attorney General to be donated to *bona fide* charitable programs selected by the Attorney General. Further, the court will issue an injunction to enjoin future violations by Smoky Mountain of §§ 57-55.2, 57-57(F), and 57-57(L) of the Solicitation law and § 59.1-203(A) of the Consumer Protection Act. The Court will also enter judgment on the bond pursuant to Conclusion of Law 165.

Finally, the Court is prepared to enter an order awarding the Commonwealth attorney's fees and expenses with costs.